UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>TOLIN GREGG,<br><br>        Defendant. | CR. 17-50044-JLV<br><br>ORDER |

**INTRODUCTION**

A grand jury indicted defendant Tolin Gregg on two counts of aggravated sexual abuse by force. (Docket 2). Now pending before the court is defendant's second motion to dismiss the indictment for government misconduct. (Docket 124). The government opposes the motion and the parties filed voluminous briefing. (Dockets 131, 151, 155, 178, 179 & 181). The court held three evidentiary hearings on the motion, during which two witnesses gave testimony and five exhibits were received into evidence. (Dockets 160, 169, 170, 172 & 173). For the reasons given below, the court denies the motion.

**DISCUSSION**

**I.    Facts**

The court described the circumstances of the alleged sexual assault in some detail in its order denying defendant's first motion to dismiss the

indictment. (Docket 120 at pp. 3-9). The court will not repeat those findings in full here, but instead will focus on facts pertinent to the present motion.

The government alleges defendant sexually assaulted R.O.H. during the early morning hours of December 23, 2016. (Docket 120 at pp. 3-4). At the time, R.O.H. was 17 and defendant was 18. Id. at p. 3. R.O.H. and Mr. Red Owl are cousins. (Docket 175 at p. 6). Defendant was friends with Mr. Red Owl's brother, Brycee Red Owl.[1] Id. R.O.H. and defendant attended the same high school. Id. at p. 39.

R.O.H., defendant and Brylee Red Owl drove to a place they called River Road near Kyle, South Dakota, on the Pine Ridge Reservation in Mr. Red Owl's vehicle. (Docket 120 at pp. 3-4). Mr. Red Owl and defendant had been drinking alcohol and continued to drink when they arrived at River Road. Id. Both defendant and Mr. Red Owl stated R.O.H. drank at River Road, but R.O.H. denied drinking that evening to law enforcement. Id. at p. 4. Defendant and R.O.H. engaged in sexual activity in the back seat of Mr. Red Owl's vehicle. Id. R.O.H. stated the sex was forced and that she physically and verbally resisted the assault. Id. Defendant stated the sex was consensual. Id. Mr. Red Owl was in the vehicle during the alleged assault. Id. at pp. 5-6.

This motion focuses primarily on an audiovisual recording Mr. Red Owl made while he, R.O.H. and defendant were leaving River Road. Approximately

---

[1]Brycee Red Owl was killed in a shooting in Kyle on June 27, 2018. United States v. Bull Bear, CR. 18-50076 (Docket 70 at p. 2). Defendant was present at the shooting as well, but is not alleged to be the shooter. Id.

2

15-20 minutes after the alleged assault, while the three were driving from River Road to Kyle, Mr. Red Owl began recording events in the vehicle on his cell phone. (Docket 175 at pp. 30-31, 43). The phone was set inside a cupholder and its camera only recorded dark images of the interior of the vehicle. Id. at pp. 25-26. It did not record any images of R.O.H. Id. at p. 26. However, the phone did capture six minutes of audio, including audio of R.O.H. speaking. Id. at pp. 25-26.

Mr. Red Owl described the recording as "an audio of [R.O.H.] mizzing out." Id. at p. 16. "Mizzing out," according to Mr. Red Owl, is slang from the Pine Ridge Reservation for "acting all miserable and . . . angry" or "out of control[.]" Id. The "main theme" of R.O.H.'s recorded audio was her anger with defendant for being a "deadbeat dad[.]" Id. at pp. 18-19. Mr. Red Owl stated that topic was "all she was talking about[.]" Id. at p. 19. R.O.H. was "slurring her words" and had a "slight bit of change in her voice." Id. at p. 20. In Mr. Red Owl's view, an independent listener would conclude R.O.H. "sounded like somebody who was really drunk[.]" Id. at p. 22. The recording did not capture R.O.H. crying or discussing the alleged sexual assault. Id. at pp. 23-24. Mr. Red Owl did not send the recording to anyone. Id. at p. 27.

Federal Bureau of Investigation Special Agent Mark Lucas ("SA Lucas") interviewed Mr. Red Owl on December 24 at his home in Kyle and at River Road. Id. at pp. 38, 41, 44. Part of the interview was recorded and transcribed. Id. at pp. 40, 44. During the recorded portion of the interview, which took place in

3

Kyle, Mr. Red Owl brought up the recording. Id. at pp. 40-42; Docket 120-1 at p. 4. He told SA Lucas, "I actually recorded a video cause I wanted her to see how she was when she was really drunk. . . . It's about six minutes. I just looked at it." (Docket 120-1 at p. 4). SA Lucas did not respond to Mr. Red Owl's statement, but instead asked him for his full name and date of birth. Id. Neither SA Lucas or Mr. Red Owl mentioned the recording again during the recorded and transcribed portion of the interview.

However, the two drove from Mr. Red Owl's home in Kyle to the River Road location where the sexual assault allegedly occurred. (Docket 175 at pp. 14-15, 44-45) (testimony from Mr. Red Owl and SA Lucas regarding the drive to River Road). SA Lucas did not record the conversation in the vehicle during the trip to River Road. Id. at p. 44. Mr. Red Owl and SA Lucas gave conflicting accounts of the conversation. SA Lucas testified he asked Mr. Red Owl to send him the recording and gave him a business card with his e-mail address. Id. at pp. 44-45. Mr. Red Owl testified SA Lucas did not ask him about the recording during the trip. Id. at p. 15.

SA Lucas did not listen to the recording while he was in the vehicle with Mr. Red Owl. Id. at pp. 57-58. SA Lucas testified he "didn't realize what kind of gravity that video would have" because "the video recording that [Mr. Red Owl] described was not of the crime." Id. at p. 58. He felt Mr. Red Owl "seemed very cooperative" and would send the recording to him via e-mail. Id. at p. 57. SA Lucas further testified he was "moving on to the next call" which "took [his]

4

attention for the next week." Id. at pp. 57-71. He had "other pressing matters" including an escaped prisoner. (Docket 176 at p. 26). SA Lucas was also reluctant to seize Mr. Red Owl's phone on Christmas Eve because he knew it would take some time to examine the phone and it was very valuable to Mr. Red Owl. Id. at p. 40.

On December 27, SA Lucas called Mr. Red Owl. (Docket 175 at p. 69). The court received into evidence an FBI phone record showing a called lasting approximately a minute and a half placed from an extension SA Lucas identified as his own to a phone number he identified as belonging to Mr. Red Owl. Id. at pp. 69-70; Hearing Ex. 103. SA Lucas testified he asked Mr. Red Owl again during that phone call to send the recording to him. (Docket 175 at pp. 70-71). SA Lucas memorialized the call in a report drafted on December 27, in which he stated he asked Mr. Red Owl for the recording. Id. at pp. 74-75; Hearing Ex. 103. SA Lucas did not contact Mr. Red Owl again after December 27. Id. at p. 70.

Mr. Red Owl deleted the recording from his phone. Id. at p. 28. He testified during an evidentiary hearing he deleted it "after a couple days when it was never brought up" because "it was unnecessary" and "taking up space on [his] phone." Id. However, he told a defense investigator that he deleted it on the morning of December 23, after he dropped defendant and R.O.H. off at their homes in Kyle. Id. at p. 35. Mr. Red Owl had the phone in his possession until he sold it to his mother shortly after Christmas of 2018, more than a year and a

5

half after the indictment and approximately two weeks after defendant filed the present motion to dismiss the indictment.  Id. at p. 31; see also Dockets 2 & 124.  Neither the government nor the defense now have the phone.  (Docket 176 at p. 45).  The defense did not make any effort to obtain Mr. Red Owl's phone or forensically examine it to determine if the recording could be recovered.[2]  (Docket 175 at pp. 31-32).  The defense plans to call Mr. Red Owl at trial and "anticipates that [he] will give truthful testimony that will be favorable to the defendant."  Id. at p. 32; Docket 87 at p. 1.

On March 21, 2017, SA Lucas testified to a federal grand jury concerning his investigation of the alleged sexual assault.  (Docket 120-2).  He testified falsely by mischaracterizing Mr. Red Owl's statements during the December 24 interview in three ways.  (Docket 120 at pp. 13-19).  SA Lucas falsely told the grand jury that Mr. Red Owl stated the following:

1. Defendant raped R.O.H.  Id. at pp. 13-16
2. R.O.H. was "crying and yelling" and "demand[ing] to be taken home" after the alleged assault.  Id. at pp. 16-17.
3. He saw a bruise on R.O.H.'s face.  Id. at pp. 17-18.

The prosecutor did not correct or clarify SA Lucas' false statements.  Id. at p. 18.

## II. Legal Standard

"A due process violation arises from destruction of evidence when the evidence 'possess[es] an exculpatory value that was apparent before the evidence

---

[2]To the court's knowledge, the government also did not examine the phone.  See Docket 176 at pp. 23-24.

6

was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" United State v. Tyerman, 701 F.3d 552, 560 (8th Cir. 2012) (quoting California v. Trombetta, 467 U.S. 479, 489 (1984)). "A higher standard of proof applies, however, when the evidence is only potentially useful to the defendant. '[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" Id. (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)).

### III. Analysis

The present motion seeks to dismiss the indictment on three grounds. First, defendant argues SA Lucas violated his right to present a complete defense by threatening Mr. Red Owl during the December 24 interview. (Docket 124 at pp. 2-10). Second, he argues SA Lucas' failure to collect Mr. Red Owl's recording and its subsequent loss violate his right to due process. Id. at pp. 11-16. Finally, he argues SA Lucas' false statements to the indicting grand jury, combined with the government's other alleged errors in the investigation and prosecution of his case, "irremediably deprived" him of a fair trial. Id. at pp. 17-18. The court previously rejected the first and third defense arguments in its order denying defendant's first motion to dismiss the indictment and rejects them again. Defendant's second argument is a closer call, but the court rejects it as well.

### A. First and third defense arguments

Defendant first argues SA Lucas' alleged intimidation of Mr. Red Owl justifies dismissing the indictment. In its previous order, the court noted the only prejudice defendant could suffer from SA Lucas allegedly intimidating Mr. Red Owl would be the government impeaching him with his interview statements because he intended to testify for the defense. (Docket 120 at pp. 27-28). Under those circumstances, the court held "the risk of prejudice is insufficient to find a deprivation of due process." Id. at p. 28. Defendant again argues the risk of the government impeaching Mr. Red Owl is sufficient prejudice to justify dismissing the indictment. (Docket 124 at p. 10). The court reaffirms its previous holding that the risk of impeachment does not justify dismissing the indictment.

Defendant's third argument asks the court to dismiss the indictment based on SA Lucas' false statements to the grand jury. In its previous order, the court adopted the magistrate judge's recommendation that the indictment not be dismissed because evidence independent of SA Lucas' false testimony supported the indictment. (Dockets 120 at p. 11 & 70 at pp. 7-8). Defendant acknowledges the court's prior holding but asserts SA Lucas' "pattern of misconduct . . . irremediably deprived [him] of a fair trial and tainted the integrity of the government's case." (Docket 124 at pp. 17-18). He cites no authority for the proposition that cumulative error justifies dismissing an indictment before trial.

On appeal, the United States Court of Appeals for the Eighth Circuit may reverse a conviction "where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." United States v. Riddle, 193 F.3d 995, 998 (8th Cir. 1999). Assuming this court possesses the same authority before trial, the court finds SA Lucas' false characterizations of Mr. Red Owl's statements to the grand jury would not support dismissing the indictment on a cumulative error basis because he will be able to truthfully testify at trial. The petite jury will not be tainted by the false testimony SA Lucas gave to the grand jury. Additionally, defendant does not identify any separate prejudice stemming from the false grand jury testimony. The court again refuses to dismiss the indictment because of SA Lucas' false grand jury testimony.[3]

### B. Failure to preserve the Red Owl recording

#### 1. Due process legal standard

The court must first determine what legal standard governs defendant's claim that the government's failure to preserve the Red Owl recording violates his right to due process. The Supreme Court has announced two separate standards. Tyerman, 701 F.3d at 560. If the recording "possess[ed] an exculpatory value that was apparent before the evidence was destroyed," the

---

[3]This holding does not condone in any respect SA Lucas' false testimony or the failure of the government "to clarify or correct obviously misleading or false testimony by the agent." (Docket 120 at p. 18).

9

standard of California v. Trombetta governs. Id. (quoting Trombetta, 467 U.S. at 489). If the recording was "only potentially useful to the defendant," the higher standard of Arizona v. Youngblood applies. Id. (citing Youngblood, 488 U.S. at 58).

Defendant argues the recording was clearly exculpatory. (Dockets 124 at pp. 13-15 & 178 at pp. 4-7). He asserts the recording would have shown:

1. R.O.H. was drunk during the early morning hours of December 23, contradicting her statement to law enforcement that she was sober and aiding a consent defense. (Docket 178 at pp. 6-7).

2. R.O.H.'s "words . . . demeanor, and . . . concerns were entirely inconsistent with that of a teen-aged girl who had just been raped[.]"[4] Id. at p. 7.

3. R.O.H.'s anger at defendant because of his parenting and, consequently, her motivation to falsely accuse defendant. Id.

Defendant further contends the exculpatory value of the recording was apparent to SA Lucas when Mr. Red Owl mentioned the recording to him during the December 24 interview. Id. at pp. 4-5.

---

[4]The government argues "[t]he premise that a sexual assault victim would, or should, have behaved in a certain way after being raped, particularly while still in the presence of her alleged rapist, is patently offensive and lacks foundation of any kind." (Docket 131 at p. 19). The court agrees that victims may respond to sexual assault in different ways, but must acknowledge the defense position could be persuasive to a reasonable juror. The government's argument does not show the recording lacks exculpatory value.

The government asserts the recording "is at best only potentially exculpatory" and asks the court to evaluate the defense motion under Youngblood. (Docket 179 at pp. 9-10). It also attempts to distinguish Trombetta by noting the facts in that case involved evidence actually possessed by the government and later destroyed, as opposed to the failure to collect evidence at issue here. Id. at p. 5. The government then proceeds to argue that SA Lucas was not acting in bad faith under Youngblood when he failed to preserve the recording. Id. at pp. 5-7.

The court finds the recording possessed exculpatory value obvious to SA Lucas before Mr. Red Owl deleted it. In the recorded portion of the December 24 interview, Mr. Red Owl told SA Lucas he recorded a video of R.O.H. while she was drunk, immediately after the alleged assault. (Docket 120-1 at p. 4). Mr. Red Owl also stated he had "just looked" at the recording, indicating it was not yet deleted as of December 24. Id. SA Lucas acknowledged during the evidentiary hearing he believed Mr. Red Owl's description of the recording was accurate and the recording would contradict R.O.H.'s statement that she had not been drinking on December 23. (Docket 175 at pp. 61-62). He also acknowledged he knew the recording could be potentially useful impeachment material for the defense. Id. at p. 62.

The government asserts the defense argument that the recording would have been valuable impeachment material is only "a showing of potential usefulness" insufficient to establish a due process violation. (Docket 179 at

11

p. 10). But evidence with undoubted impeachment value is exculpatory and the government violates a defendant's due process rights by suppressing it. Giglio v. United States, 405 U.S. 150 (1972). During the December 24 interview, SA Lucas knew the recording showed R.O.H. acting drunkenly, contradicting statements she had very recently given to law enforcement. Evidence that R.O.H. was drunk during the alleged sexual assault could easily impact her credibility before a jury. This is especially true because R.O.H. denied she had been drinking to law enforcement. The recording "possses[ed] an exculpatory value that was apparent" to SA Lucas on December 24, before it was deleted, because it had the potential to seriously undermine her credibility at trial. (Docket 124 at p. 13). The court will evaluate defendant's due process claim under Trombetta.

### 2. **Trombetta analysis**

In Trombetta, the Supreme Court held "[w]hatever duty the Constitution imposes . . . to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488. The Court explained "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means" before the failure to preserve the evidence amounts to a due process violation. Id. at 489. The court found the Red Owl recording possessed an exculpatory value apparent before its deletion. See supra Section

12

III.B.1. The court concludes, however, that defendant can present evidence comparable to the recording at trial by calling Mr. Red Owl as a witness. Accordingly, the court finds SA Lucas did not violate defendant's right to due process by failing to preserve the recording.

Mr. Red Owl has, since he was first interviewed on December 24, 2016, consistently described the recording as showing R.O.H. acting "really drunk." (Docket 120-1 at p. 4). In the evidentiary hearing, Mr. Red Owl described the recording in detail. (Docket 175 at pp. 16-27). He testified the recording showed R.O.H. not only acting drunk, but also berating defendant for his supposed parenting failures. Id. at pp. 18-20. The court found Mr. Red Owl credible and there is no obvious reason a jury could not also find him credible.[5]

Perhaps anticipating this conclusion, defendant asserts the recording is "irreplaceable." (Docket 178 at p. 7). In his view,

> [n]o amount of testimonial description . . . could have the persuasive power or probative value of the 6 minute audio recording of R.O.H., extremely drunk and "mizzing out" on [defendant], not for having done sexual violence to her, but for not being a responsible father to her cousin's children.

Id. at p. 8. The court agrees that Mr. Red Owl's testimony is not an exact substitute for the recording, but that is not the test set out in Trombetta. If "comparable evidence" obtainable "by other reasonably available means" is available, defendant cannot show a due process violation. Trombetta, 467 U.S. at 489. Mr. Red Owl's testimony need not have identical "persuasive power or

---

[5]In his post-hearing brief, defendant agreed that Mr. Red Owl testified credibly. (Docket 178 at p. 12).

probative value" as the recording to be comparable under Trombetta. If Mr. Red Owl's trial testimony is similar to the testimony he gave at the evidentiary hearing, the court finds it will have substantial and favorable evidentiary value for the defense.

Defendant also points out that the government will likely attack Mr. Red Owl's credibility at trial, while the recording would have been unimpeachable. (Docket 178 at p. 21). It is certainly true that the recording would have corroborated Mr. Red Owl's testimony. However, the recording would not have shed direct light on the ultimate question the jury will have to resolve—whether R.O.H. is a credible accuser. If the jury believes R.O.H.'s testimony, the recording would likely be insignificant in comparison. The court disagrees with defendant's assertion that the recording, "[c]oupled with [Mr.] Red Owl's testimony . . . would have almost assured a not guilty verdict." Id. A jury could have believed R.O.H. and accordingly found defendant guilty beyond a reasonable doubt even if the recording were entered into evidence. Loss of corroborating evidence, even strong corroborating evidence, does not equate loss of irreplaceable evidence under Trombetta. In the court's judgment, Mr. Red Owl's testimony is comparable to the recording and will be available to defendant at trial.

This conclusion is also bolstered by the strength of the evidence available to defendant. Defendant has access to Mr. Red Owl's favorable and potentially pivotal testimony. As defendant points out, there were three people in the vehicle during the alleged sexual assault and two of them, he and Mr. Red Owl,

"would testify that no rape occurred." Id. at p. 22. Defense counsel also has extensive impeachment material on SA Lucas, the primary government investigator in this case, regarding his history of testifying falsely and his conspicuous failure to collect the recording. The court's analysis could have been different if Mr. Red Owl were not planning to testify favorably for the defense or the defense case were otherwise weaker than it is. Under these circumstances, however, the court concludes Mr. Red Owl's testimony is comparable to the recording in evidentiary value. Consequently, no due process violation occurred and the court must deny the motion to dismiss the indictment.

**IV. Conclusion**

The court finds SA Lucas did not infringe defendant's due process right "to present a complete defense," as interpreted by Trombetta, by failing to collect the Red Owl recording.[6] Trombetta, 467 U.S. at 485. Having resolved the defense motion under Trombetta, the court need not consider SA Lucas' good or bad

---

[6]The court notes that, even if it found a due process violation and proceeded to determine an appropriate remedy, defendant would have faced a high bar to achieve dismissal of the indictment. "Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice. . . . '[A]bsent demonstrable prejudice, or the substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate.' " United States v. Wadlington, 233 F.3d 1067, 1073-74 (8th Cir. 2000) (quoting United States v. Morrison, 449 U.S. 361, 365 (1981)). "[T]he drastic step of dismissing an indictment is a disfavored remedy[.]" United States v. Manthei, 979 F.2d 124, 126 (8th Cir. 1992) (internal quotation omitted). It is difficult to conclude defendant suffered substantial prejudice from the loss of the recording when Mr. Red Owl will testify as to its contents, even assuming SA Lucas' failure to collect the recording constitutes flagrant government misconduct.

15

faith. Tyerman, 701 F.3d at 560. The parties have not asked the court to consider whether it remains appropriate to allow the government to impeach Mr. Red Owl with his statements from the December 24 interview in light of the increased importance of Mr. Red Owl's credibility created by SA Lucas' failure to collect the recording. See Docket 120 at p. 28 (noting "it may be proper to readdress" the court's decision to allow use of Mr. Red Owl's December 24 interview statements "if the circumstances of the case change[.]"). The court would entertain a motion to reconsider its prior ruling on this topic.

**ORDER**

For the reasons given above, it is

ORDERED that defendant's second motion to dismiss the indictment (Docket 124) is denied.

IT IS FURTHER ORDERED that a scheduling order shall issue.

Dated September 9, 2019.

                BY THE COURT:

                /s/ *Jeffrey L. Viken*
                JEFFREY L. VIKEN
                CHIEF JUDGE